# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

JEKYLL ISLAND-STATE          )
PARK AUTHORITY,              )
                             )
    Plaintiff,           )
                             )
    v.                   )          2:21-CV-8
                             )
POLYGROUP MACAU LIMITED,     )
                             )
    Defendant.           )

## ORDER

This action is before the Court on Defendant's renewed motion to dismiss for lack of personal jurisdiction. Dkt. No. 47. In its opposition to Defendant's motion, Plaintiff requests sanctions. Dkt. No. 51 at 22. For the reasons given below, the Defendant's motion is **GRANTED** and Plaintiff's request for sanctions is **DENIED**.

## BACKGROUND

This case involves a dispute over Defendant Polygroup Macau Limited's ("PML") alleged use of Plaintiff Jekyll Island-State Park Authority's ("JISPA") "SUMMER WAVES" (or "summer waves") trademark.[1] Dkt. No. 6. JISPA is a state-created entity entrusted

---

[1] "Where there are conflicts between the evidence [relating to personal jurisdiction], the court makes all reasonable inferences in favor of the plaintiff." <u>Websters Chalk Paint Powder, LLC v. Annie Sloan Interiors, Ltd.</u>, No. 1:13-CV-2040-WSD, 2014 WL 4093669, at *3 (N.D. Ga. Aug. 18, 2014) (citing <u>Diamond Crystal</u>

with the care of Jekyll Island, Georgia. Dkt. No. 6 ¶¶ 2, 7. Since 1988, JISPA has operated the Summer Waves Water Park on the island and has continually used its Summer Waves trademark in commerce. Id. ¶¶ 17-25. JISPA has also owned and operated its website, www.summerwaves.com, since approximately 2001. Id. ¶ 24. Through its website, JISPA advertises its park and sells summer-waves-branded merchandise nationally. Id. ¶ 24. JISPA also owns a federal trademark registration for summer waves in Class 41, id. ¶ 26, which covers goods for use in education and entertainment,[2] see, e.g., Get Ready to Search – Classification and Design Search Codes, USPTO, https://www.uspto.gov/trademarks/search/get-ready-search-classification-and-design#Classification%20find%20trademarks%20used%20on%20goods%20and%20services%20related%20to%20yours. JISPA registered its mark specifically for use in connection with "entertainment services, namely, providing recreational services at an amusement park featuring water rides at a public park." Dkt. No. 6 ¶ 26.

---

Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257 (11th Cir. 2010)).

[2] "The Lanham Act, in § 30, empowers the Commissioner of Patents and Trademarks to establish a system for the classification of goods and services. The purpose of such classification is for the convenience of the PTO—not to limit or extend the applicant's rights." 74 Am. Jur. 2d Trademarks and Tradenames § 39 (Nov. 2022 Update).

PML is incorporated in the British Virgin Islands, and its registered office is in the British Virgin Islands. Dkt. No. 47-1 at 6:7-8, 12:17-133. PML is wholly owned by Polygroup Asia Pacific Limited, which is also a British Virgin Islands company. Id. at 10:25-11:5; Dkt. No. 47-2 at 6, 7.  PML has two directors who both reside in Hong Kong. Dkt. No. 47-2 at 6. The parties dispute whether PML has any employees, but taking inferences in favor of JISPA as the Court must on a motion to dismiss, PML has an officer who serves as its Senior Vice President and Head of North American operations. Compare Dkt. No. 47 at 8 ("PML has no employees." (citing Dkt. No. 47-1 at 7:18-22, 8:25-9:1; Dkt. No. 47-2 at 5-6)) with Dkt. No. 51 at 13 (noting that a man named "Eric Wong" signed a 2017 assignment contract on behalf of PML listing himself as the "SVP, Head of North American Operations" (citing Dkt. No. 51-21)). One of the individuals PML identifies as a director, dkt. no. 47-2 at 6, also traveled to the United States to execute a deal on behalf of PML, and he signed the agreement as PML's CEO, dkt. No. 51-23 at 5, dkt. no. 51 at 13.

PML is an intellectual property holding company that licenses other entities' use of its marks. Dkt. No. 47-1 at 37:1-4; Id. at 39:5-7. It has licensed and assigned various intellectual property holdings to multiple U.S.-based companies. Dkt. No. 51 at 5. PML "does not engage in any customer sales activity any place in the world." Dkt. No. 47-1 at 25:25-26:1. PML is not registered to do

business in any United States jurisdiction. Dkt. No. 47-1 at 24:7-9. The company does not import or distribute any items into the United States, nor does it hold a United States import license. Id. at 22:4-7. PML does not have any bank accounts in the United States, own any property in the United States, or lease any property in the United States. Dkt. No. 47-1 at 17:8-10, 17:22-18:4. PML has also never paid taxes to any state or governmental body in the United States. Dkt. No. 47-1 at 21:23-25.

PML holds federal trademark registrations for "SUMMER WAVES," "SUMMER WAVES 3D," and "SUMMER WAVES ELITE" ("PML's summer waves marks") in Class 28 (toys and sporting goods) for use on a variety of inflatable recreational pools and other similar pool-related products.[3] Dkt. No. 6 ¶ 35; see also USPTO, supra. PML's summer waves marks were used in commerce in the United States in March of 2014. Dkt. No. 47-1 at 31:18-32:11; id. at 35:16-36:11.

PML has one subsidiary, Polygroup Limited Macao Commercial Offshore ("MCO"), which is incorporated in Macau. Dkt. No. 47-2 at 6, 8. MCO pays PLM an annual "management service fee." Dkt. No. 51

_____

[3] Specifically, PML has registered the marks for use on "[i]nflatable pools for recreational use; play swimming pools; inflatable toys; inflatable swimming pool toys; inflatable ride-on toys; inflatable inner tubes for aquatic recreational use; inflatable toy water-slides; inflatable toy furniture; inflatable boats used as toys; floating recreational lounge chairs; inflatable float mattresses and pads for recreational use; swim floats for recreational use; beach balls and inflatable balls not for exercise use; ring buoys for recreational use; swimming aids, namely, pool rings." Dkt. No. 6 ¶ 35.

4

at 5.   MCO sells products and transfers title to various global
retailers. Dkt. No. 47-1 at 22:20-25. The global retailers then
bring the product to the markets of their choice. Id.

Polygroup Services NA is a Delaware company and another
Polygroup member company. Dkt. No. 47-1 at 23:10-19; Dkt. No. 47-
2 at 9. Polygroup Services NA buys products, including products
bearing PML's summer waves marks, from Polygroup Trading, another
Polygroup Member Company. Dkt. No. 47-1 at 27:19-20.  The parties
dispute whether Polygroup Services NA imports and sells some of
the summer-waves-branded product in the United States, pointing to
conflicting testimony. Dkt. No. 47-1 at 30:18-20 (Q: "Does
Polygroup Services NA import products to the United States bearing
the Summer Waves trademark owned by PML? A: "Yes."); Dkt. No. 47-
1 at 27:19-23 ("I'm not aware of any of it being branded to Summer
Waves."); id. at 28:6-7 (explaining that Polygroup Services NA
sells artificial Christmas Trees and decorations to a customer in
the United States but stating "I do not believe that any of that
is branded Summer Waves, no."); id. at 28:8-22 ("Retailers in the
United States buy [Summer Waves branded kiddie pools]. Whether
they're buying them through [Polygroup Services NA], meaning
[Polygroup Services NA] buys and then resells, you know, from a
location in the United States or whether it's bought directly out
of the Mexican factory, I'm—I'm not 100 percent sure, you know,
of—of how that transaction flows"). Taking inferences in favor of

JISPA, as the Court must when considering PML's motion to dismiss, Polygroup Services NA imports and sells summer waves branded product in the United States.

PML has been involved in multiple lawsuits in the United States, both as a plaintiff and defendant. Dkt. No. 65 at 6-7 ("Jekyll identified at least 34 actions in the United States courts or tribunals in which PML is or was a party."). In four actions where PML was the sole plaintiff, it pled that it "marketed, distributed and sold" products in the United States. Dkt. No. 51 at 3. In one of those cases, when it filed suit against a particular party, PML asserted that it does market, distribute, and sell products in the United States; but then when the same party sued PML, PML denied that it sold, imported, or distributed products in the United States. Id. According to PML, all these statements were mistakes. Dkt. No. 52 at 15. The cases where PML stated it marketed, distributed, or sold products in the United States are no longer pending. Id.

In early 2021, through its Georgia counsel, PML asked JISPA if it could purchase JISPA's domain name. Dkt. No. 6 ¶ 34. As a result, JISPA learned about PML's summer waves marks. Id. ¶ 35. JISPA then initiated this suit against PML, alleging that PML infringed JISPA's summer waves mark by registering and licensing highly similar marks. Dkt. No. 1. Specifically, JISPA alleges that PML committed federal trademark infringement under 15 U.S.C.

§ 1114 (Count I), id. ¶¶ 55-63; federal unfair competition under 15 U.S.C. § 1125(a) (Count II), id. ¶¶ 64-70; common law trademark infringement and unfair competition (Count III), id. ¶¶ 71-79; and fraud that merits trademark registration cancellation under 28 U.S.C. §§ 1119, 1120 (Count IV), id. ¶¶ 80-92.

PML filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to partially dismiss for failure to state a claim for trademark cancellation. Dkt. No. 10. JISPA then filed a response in opposition or, in the alternative, a motion for limited discovery. Dkt. No. 17. The Court denied PML's motion and granted JISPA's request for a limited period of jurisdictional discovery. Dkt. No. 37 at 4. After the close of jurisdictional discovery, PML filed a renewed motion to dismiss for lack of jurisdiction or, in the alternative, to partially dismiss for failure to state a claim. Dkt. No. 47. JISPA opposes that motion and, in its opposition brief, requests sanctions. Dkt. No. 51 at 22. The issues are fully briefed, see dkt. nos. 47, 51, 52, 65, and thus ripe for review.

### LEGAL STANDARD

"When a district court does not conduct a discretionary evidentiary hearing on a motion to dismiss for lack of jurisdiction, the plaintiff must establish a prima facie case of personal jurisdiction over a nonresident defendant." Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990) (citing Morris v. SSE,

Inc., 843 F.2d 489, 492 (11th Cir. 1988)). "A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." Id. When evidence is introduced to support or rebuff personal jurisdiction, "[w]here there are conflicts between the evidence, the court makes all reasonable inferences in favor of the plaintiff." Websters Chalk Paint Powder, 2014 WL 4093669, at *3 (citing Diamond Crystal, 593 F.3d at 1257). When deciding Rule 12(b) motions to dismiss, the court must first resolve any personal jurisdiction challenges before deciding whether the plaintiff has stated a claim for relief. Madara, 916 F.2d at 1513-14.

## DISCUSSION

First, this case benefits from clarification of a few key concepts. This case implicates subject matter jurisdiction; state-centered personal jurisdiction (both specific and general); and Rule 4(k)(2) nationwide personal jurisdiction (both specific and general). As a result, the confines of these concepts merit review.

To begin, subject matter jurisdiction refers to the types of disputes and relief a court may rule upon. Jurisdiction, Black's Law Dictionary (11th ed. 2019) (defining subject matter jurisdiction as "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things"). Federal courts, for example, are courts of limited subject matter jurisdiction,

which means they may hear only certain types of cases as authorized
by the federal Constitution and federal statutes. See, e.g., U.S.
Const. art. III § 2 (defining the jurisdiction of federal courts);
28 U.S.C. § 1331 (granting district courts "original jurisdiction
[in] all civil actions arising under the Constitution, laws, or
treatises of the United States"). Certain state courts are courts
of general subject matter jurisdiction, which means they have the
authority to rule upon any type of case and provide any type of
relief. Cf. Court, Black's Law Dictionary (11th ed. 2019)(defining
a "court of general jurisdiction" as "[a] court having unlimited
or nearly unlimited trial jurisdiction in both civil and criminal
cases"); O.C.G.A. § 15-6-8 (permitting the Georgia Superior Courts
to "exercise original, exclusive, or concurrent jurisdiction, as
the case may be, of all causes, both civil and criminal, granted
to them by the Constitution and laws"). General *subject matter*
jurisdiction differs from general *personal* jurisdiction, as
explained below.

Unlike subject matter jurisdiction, personal jurisdiction
refers to a court's authority to adjudicate a particular
defendant's rights. See Jurisdiction, Black's Law Dictionary (11th
ed. 2019) (defining personal jurisdiction as "[a] court's power to
bring a person into its adjudicative process; jurisdiction over a
defendant's personal rights, rather than merely over property
interests"). Two types of personal jurisdiction analyses are

relevant in this case: the "typical" state-centered personal jurisdiction analyses and the nationwide analyses under Rule 4(k)(2).[4]

The "typical" state-centered bases for personal jurisdiction examine a defendant's contacts *with a particular state* to determine whether the federal court may exercise jurisdiction. See, e.g., Daimler AG v. Bauman, 571 U.S. 117, 127 (2014) (defining and comparing specific and general personal jurisdiction). This state-centered inquiry includes two types of personal jurisdiction: "specific" and "general" jurisdiction. Id.

For a court to exercise specific personal jurisdiction, the long-arm statute of the state in which the court sits must authorize it to exercise specific jurisdiction in the case, and the court's exercise of specific jurisdiction must comport with the Due Process Clause of the Fourteenth Amendment. Del Valle v. Trivago GMBH, 56 F.4th 1265, 1272 (11th Cir. 2022). The Due Process Clause requires, in part, that a plaintiff's claim "arise out of or relate to" a defendant's contacts *with a state*. Id. at 1275.

In contrast, the Fourteenth Amendment Due Process Clause

---

[4] Rule 4(k)(2)(a) permits a federal court to exercise *personal* jurisdiction if, among other requirements, "the defendant is not subject to jurisdiction in any state's court of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(a). This clause—perhaps confusingly—refers to both personal and subject matter jurisdiction. For clarity's sake, it could also read: "the defendant is not subject to [personal] jurisdiction in any state's court of general [subject matter] jurisdiction."

permits a court to exercise general personal jurisdiction over a plaintiff's claim even if the claim is unrelated to the defendant's contacts *with the state*. Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1292 (11th Cir. 2000). A court has general personal jurisdiction over a defendant *person* if the person is domiciled in the *state* where the court sits. Daimler, 571 U.S. at 137 (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011)). Corporations, as legal fictions, do not have domiciles. Thus, courts may exercise general personal jurisdiction over a defendant corporation in *states* where a corporation's contacts are analogous to a person's domicile: the corporation's *state* of incorporation and the *state* containing its principal place of business. Id. General personal jurisdiction may also adhere over a corporation if its contacts *with a state* are "so 'continuous and systematic' as to render [it] essentially at home in the forum state." Id. at 127 (citing Goodyear, 564 U.S. at 919). Thus, both "typical" forms of specific and general jurisdiction require *state-centered* analyses of a defendant's contacts with the state in which the court sits.

Rule 4(k)(2), in contrast, utilizes a *nationwide* analysis of a defendant's contacts under the Fifth Amendment Due Process Clause. See Sherrit, 216 F.3d at 1291, 1291 n.6. Rule 4(k)(2) authorizes federal courts to exercise personal jurisdiction in certain instances where the typical state-centered personal

jurisdiction analyses would not permit its exercise. Id. at 1291. Under Rule 4(k)(2), courts follow nearly the same analyses as for typical state-centered specific and general jurisdiction. Id. However, under Rule 4(k)(2), courts must examine a defendant's contacts with the *United States as a whole*, instead of the defendant's contacts with a *particular state*. Id. at 1291 n.6. Thus, Rule 4(k)(2) also permits its own type of specific and general jurisdiction, only this exercise of personal jurisdiction is based upon a defendant's nationwide contacts. With these concepts in mind, the Court proceeds with its analysis, beginning with the "typical" state-centered personal jurisdiction analyses.

### I. PML does not have sufficient minimum contacts with Georgia to confer specific or general jurisdiction.

PML argues that it is not subject to personal jurisdiction because Georgia's long-arm statute does not reach PML and the exercise of personal jurisdiction over PML would violate due process. Dkt. No. 47 at 10-19. JISPA seemingly concedes this, arguing only that Rule 4(k)(2) general jurisdiction authorizes jurisdiction over PML. See Dkt. No. 51 at 6-20; Dkt. No. 65 at 2-6. Rule 4(k)(2) authorizes jurisdiction only if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." Thus, the Court will first determine whether the "typical" state-centered personal jurisdiction analyses authorize the exercise of personal jurisdiction in this case.

**A. Specific Jurisdiction**

First, the Court must determine the law that governs its
state-centered personal jurisdiction analyses. "Even in cases
arising under federal law, '[f]ederal courts ordinarily follow
state law in determining the bounds of their jurisdiction over
persons.'" Del Valle, 56 F.4th at 1272 (quoting Daimler, 571 U.S.
at 125); see also Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d
623, 626-27 (11th Cir. 1996) ("When jurisdiction is based on
a federal question arising under a statute that is silent
regarding service of process, Rule 4(e) of the Federal Rules of
Civil Procedure directs us to look to the state long-arm statute
in order to determine the existence of personal jurisdiction."
(citing Cable/Home Commc'n v. Network Prods., 902 F.2d 829, 855
(11th Cir. 1990))). Thus, even though JISPA asserts one state-law
claim and three federal claims, the Court follows Georgia law in
determining the bounds of its jurisdiction over PML. Dkt. No. 6
¶¶ 55-92 (asserting subject matter jurisdiction based on federal
question jurisdiction, original jurisdiction for an action arising
under an Act of Congress related to trademarks, and supplemental
jurisdiction).

Following state law, "a federal court generally undertakes a
two-step analysis to determine whether there is personal
jurisdiction over a nonresident defendant." Del Valle, 56 F.4th at
1272 (citing Sculptchair, 94 F.3d at 626). "First, the court must

determine whether the plaintiff has alleged sufficient facts to subject the defendant to the forum state's long-arm statute," and "[s]econd, if the court determines that the forum state's long-arm statute has been satisfied, it must then decide whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." Id. The Fourteenth Amendment Due Process clause "requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

A defendant has minimum contacts for the purposes of specific jurisdiction if

> [f]irst, the contacts [are] related to the plaintiff's cause of action or have given rise to it. Second, the contacts . . . involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum [are] such that the defendant should reasonably anticipate being haled into court there.

U.S. S.E.C. v. Carrillo, 115 F.3d 1540, 1542 (11th Cir. 1997) (alterations accepted) (quoting Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1546 (11th Cir. 1993)).

If a defendant has minimum contacts, the court must determine whether "the exercise of jurisdiction . . . offend[s] 'traditional

notions of fair play and substantial justice,'" Mut. Serv. Ins. Co., 358 F.3d at 1319 (quoting Int'l Shoe Co., 326 U.S. at 316), by examining "the burden on the defendant, the interests of the forum, and the plaintiff's interest in obtaining relief," Carrillo, 115 F.3d at 1547 (alterations accepted) (quoting Vermeulen, 985 F.2d at 1551).

### i. Georgia Long Arm Statute

The Court must first determine whether sufficient facts are alleged to subject PML to Georgia's long-arm statute. This case implicates three subsections of Georgia's long-arm statute. See O.C.G.A. § 9-10-91(1)-(3); Dkt. No. 47 at 17-18. O.C.G.A. § 9-10-91(1) authorizes a court to exercise jurisdiction over a defendant who "[t]ransacts any business within this state." To satisfy this subsection, the nonresident defendant must have "*purposefully done some act or consummated some transaction in* [*the*] *state.*" Diamond Crystal, 593 F.3d at 1260 (quoting Aero Toy Store, LLC v. Grieves, 631 S.E.2d 734, 736-37 (Ga. Ct. App. 2006)). However, "nothing in subsection (1) requires the physical presence of the nonresident in Georgia or minimizes the import of a nonresident's intangible contacts with the State." Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, 620 S.E.2d 352, 355 (Ga. 2005). Subsection (1) should be interpreted literally, and it extends to the maximum extent permitted by procedural due process. Id.; see also Diamond Crystal, 593 F.3d at

1261 ("Lest there be any misunderstanding, this language does *not* mean that subsection (1)—or any provision of the long-arm statute—is coextensive with constitutional due process. Rather, this language makes clear that due process concerns may limit the full extent of the 'transacts any business' prong. But this certainly does not mean that the two inquiries are one and the same.").

PML's Georgia contacts are as follows: (1) PML has attorneys based in Atlanta, Georgia, and PML used these attorneys to register the marks at issue, dkt. no. 51-1 ¶¶ 71, 134, dkt. no. 51-21 at 173:13-16; (2) PML's General Counsel, a Georgia-barred attorney, contacted JISPA while he was in Georgia and asked to buy JISPA's website domain name, dkt. no. 51-21 at 55:6-56:24, dkt. no. 22 ¶¶ 8-9; (3) customers in Georgia can buy products bearing PML's summer waves marks online and have them delivered to Georgia, dkt. no. 6-8 at 2-3, dkt. no. 24 ¶¶ 6-21, dkt. no. 22 ¶¶ 10-27; and (4) customers in Georgia can purchase products bearing PML's summer waves marks from retail locations run by PML's licensees, dkt. no. 21 ¶¶ 24-38, dkt. no. 51 at 5.

That customers in Georgia can buy goods bearing PML's summer waves marks over the internet and from retailers does not qualify as PML "transacting business" in Georgia because it does not indicate that PML has "*purposefully done some act or consummated some transaction*" in Georgia. Diamond Crystal, 593 F.3d at 1260

(quoting <u>Aero Toy Store</u>, 631 S.E.2d at 736-37).  PML only licensed its marks; it did not operate the website selling products bearing the marks or otherwise sell products bearing the marks directly to consumers. Dkt. No. 51-1 ¶¶ 84-88; Dkt. No. 47-1 at 25:25-26:1; Dkt. No. 47-2 at 12. Absent any indication that PML purposefully directed its marks at customers in Georgia—facts that JISPA does not allege and that are not supported by the evidence—that customers in Georgia received goods bearing PML's summer waves marks is insufficient on its own to show that PML transacted business in Georgia. <u>See</u> <u>Jordan Outdoor Enters., Ltd. v. That 70's Store, LLC</u>, 819 F. Supp. 2d 1338, 1343 (M.D. Ga. 2011) (finding that the defendants did not transact business in Georgia where they operated websites that did not target Georgia or generate any business for the defendants in Georgia).

PML's other Georgia contacts, however, satisfy O.C.G.A. § 9-10-91(1). PML argues that it has not transacted business in Georgia, relying upon the testimony of Eric Szweda, PML's 30(6)(b) deponent. Dkt. No. 47 at 18. Mr. Szweda testified that "[PML] doesn't do business in the United States," and "[PML] has no footprint, profile, business activity, in the United States of America in any way whatsoever." Dkt. No. 47-1 at 21:25, 38:10-12. As discussed above, these assertions do not fully encapsulate the scope of O.C.G.A. § 9-10-90(1). Georgia courts have repeatedly held that the "transacts any business" requirement should be

17

interpreted literally, and thus may include intangible contacts such as negotiating and applying for an insurance policy. <u>See, e.g.,</u> <u>Lima Delta Co. v. Glob. Aerospace, Inc.</u>, 752 S.E.2d 135, 139 (Ga. Ct. App. 2013) (holding that insureds transacted business in Georgia when their agent negotiated an insurance policy with Wells Fargo's Atlanta office); <u>Genesis Rsch. Inst., Inc. v. Roxbury Press., Inc.,</u> 542 S.E.2d 637, 639 (Ga. Ct. App. 2000) ("The negotiation of the terms of an agreement within the confines of the State of Georgia constitutes transacting business within the meaning of the Georgia Long Arm Statute, OCGA § 9-10-91(1)."). PML has a longstanding relationship with its Atlanta counsel, its General Counsel is barred in Georgia, and PML directed its general counsel to reach out to JISPA to negotiate a sale of JISPA's domain name. Dkt. No. 51-1 ¶¶ 71, 134; Dkt. No. 51-21 at 173:13-16; Dkt. No. 51-21 at 55:6-56:24; Dkt. No. 22 ¶¶ 8-9. PML directing its Georgia-based counsel to reach out to JISPA—a Georgia-state created entity—to negotiate a sale is a purposeful act done in Georgia. Thus, PML has "transacted business" in Georgia. PML has also "transacted business" in Georgia through its employment of Georgia-based counsel. Accordingly, JISPA has alleged sufficient facts to subject PML to § 9-10-91(1) of Georgia's long-arm statute. The same cannot be said for the next subsection.

O.C.G.A. § 9-10-91(2) permits a court to exercise jurisdiction if the defendant "[c]ommits a tortious act or omission

within this state." JISPA alleges that PML's retail partners
located in Georgia sold product with PML's summer waves marks—but
JISPA does not allege that PML acted within the state, that PML
encouraged its retail partners to sell product bearing its marks
in Georgia, or that JISPA had reason to know that its product would
end up in Georgia. Dkt. No. 21 ¶ 24; see generally Dkt. No. 6.
Because PML's alleged tortious actions did not occur *within* the
state, O.C.G.A. § 9-10-91(2) does not authorize jurisdiction in
this case.

Lastly, O.C.G.A. § 9-10-91(3) authorizes jurisdiction where
a defendant "[c]ommits a tortious injury in this state caused by
an act or omission outside this state if the tort-feasor regularly
does or solicits business, or engages in any other persistent
course of conduct, or derives substantial revenue from goods used
or consumed or services rendered in this state." JISPA alleges
that PML committed a tortious injury—trademark infringement and
unfair competition—in the state, and PML engages in a persistent
course of conduct within the state through its use of its Atlanta
counsel. Dkt. No. 6 ¶ 1; Dkt. No. 51-21 at 172:12-15, 174:13-16,
178:13-25. This could arguably satisfy O.C.G.A. § 9-10-91(3).[5]

_____

[5] As discussed below, infra pp. 20-21, 27-35, these claims do not
arise from or relate to PML's contacts. Georgia courts sometimes
include this inquiry within their long-arm analysis instead of as
part of the due process inquiry. See, e.g., Allstate Ins. Co. v.
Klein, 422 S.E.2d 863, 864 (Ga. 1992); O.C.G.A. § 9-10-91 ("A court
of this state may exercise personal jurisdiction over any

### ii. Fourteenth Amendment Due Process

JISPA has cleared the first hurdle, but it cannot clear the second. Although PML "transacts business" in Georgia, it does not have sufficient minimum contacts with Georgia for the Court to exercise personal jurisdiction because JISPA's claims do not arise from or relate to PML's relationship with its Atlanta counsel or PML's attempt to purchase JISPA's domain name. At minimum, for a suit to arise out of or be related to a contact, "the contact must be a 'but-for' cause of the tort." Fraser v. Smith, 594 F.3d 842, 850 (11th Cir. 2010) (quoting Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1222-23 (11th Cir. 2009)). In this case, PML's contacts with its Atlanta counsel are not the but-for cause of JISPA's claims. JISPA's claims are not based on PML's attempt to purchase its domain name or tortious actions taken by PML's counsel.[6] Therefore, the Court may not exercise specific personal jurisdiction over PML. The next option is general personal jurisdiction. This, too, fails.

_____

nonresident . . . as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section."). Applying this approach, neither O.C.G.A. § 9-10-90(2) nor O.C.G.A. § 9-10-90(3) are satisfied.

[6] Even if PML's contacts with its Atlanta counsel can be said to be a but-for cause of JISPA's claims because PML used its Atlanta-counsel to register the mark at issue, this connection is too causally attenuated for the claim to arise from these contacts for the reasons discussed infra pages 27-35.

**B. General Jurisdiction**

JISPA does not argue—nor would it succeed in arguing—that the Court has general jurisdiction over PML due to PML's contacts with Georgia. Dkt. No. 51 at 6-20 (arguing only that the court has personal jurisdiction under a Rule 4(k)(2) general jurisdiction analysis); Dkt. No. 65 at 2-6 (same). "The paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business." Daimler, 571 U.S. at 118 (citing Goodyear, 564 U.S. at 924). A foreign corporation's contacts with a state might also be "'so continuous and systematic' as to render it essentially at home in the forum State." Id. at 119 (citing Goodyear, 546 at 919).

PML is incorporated in the British Virgin Islands with its registered office in the British Virgin Islands. Dkt. no. 47-1 at 6:7-8, 12:17-13:3. Thus, the paradigm forums do not provide general jurisdiction over PML. Further, PML's contacts with Georgia are not nearly "'so continuous and systematic' as to render it essentially at home" in Georgia. Daimler, 571 U.S. at 118 (citing Goodyear, 546 at 924). In Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416-18 (1984), the Supreme Court held that a defendant who (1) purchased more than $4 million worth of product from Texas through a contract negotiated and executed in Texas, (2) sent employees to Texas for training, and (3) received over $5 million in payments drawn upon a bank in Texas was not

subject to general jurisdiction in the state. PML's contacts with Georgia are far less than the defendant's in <u>Helicopteros</u>; PML attempted to buy JISPA's domain name, PML uses counsel based in Georgia, and product bearing PML's marks have entered Georgia.

In contrast, in <u>Perkins v. Benguet Consolidated Mining Co.</u>, 342 U.S. 437, 447-49 (1952), the Supreme Court found that the defendant was subject to general jurisdiction when the defendant company's president moved his office from the Philippines to Ohio while the Philippines were occupied by the Japanese. The company's president kept office files in Ohio; conducted business correspondence from the office; drew and distributed salary checks from the office; used various Ohio banks for company business; and held directors' meetings at the office. <u>Id.</u> In other words, because the company's president moved its operation center to Ohio, the company was essentially "at home" in Ohio. Unlike the defendant's contacts in <u>Perkins</u>, PML's sporadic contacts with Georgia are in no way functionally equivalent to moving its operation center to Georgia. Thus, the Court may not exercise general jurisdiction over PML based on its Georgia contacts. Because neither the state-centered specific nor general personal jurisdiction analyses authorize the Court to exercise personal jurisdiction over PML, the Court next examines whether Rule 4(k)(2) authorizes personal jurisdiction.

**II. PML does not have sufficient minimum contacts with the United States to confer specific or general jurisdiction over it under Rule 4(k)(2).**

Federal Rule 4(k)(2) permits a court to exercise personal jurisdiction over a claim that arises under federal law if "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Here, one of JISPA's claims does not arise under federal law: JISPA's state common law trademark infringement and unfair competition claim (Count II). Dkt. No. 6 ¶¶ 71–79. Because this claim does not arise under federal law, Rule 4(k)(2) does not permit the Court to exercise jurisdiction as to that claim. As discussed, none of the "typical" state-centered avenues for personal jurisdiction permit the Court to exercise personal jurisdiction over this claim. Thus, JISPA's common law trademark infringement and unfair competition claim is **DISMISSED without prejudice.**

JISPA, however, also alleges three federal claims: federal trademark infringement, dkt. no. 6 ¶¶ 55–63; federal unfair competition, id. ¶¶ 64–70; and fraud that merits trademark registration cancellation, id. ¶¶ 80–92. Following Rule 4(k)(2)'s requirements, the Court must next determine, as to JISPA's three federal claims, (1) whether PML is subject to personal jurisdiction in any state's courts of general jurisdiction for its federal

23

claims and (2) whether exercising jurisdiction is consistent with the United States Constitution and laws.

**A. Not subject to jurisdiction in any state's courts of general jurisdiction**

PML argues that Rule 4(k)(2) cannot apply because it has identified Virginia as a forum state in which it is subject to jurisdiction. Dkt. No. 52 at 8. In <u>Oldfield</u>, 558 F.3d at 1218 n.22, the Eleventh Circuit held that a burden-shifting approach applies to a Rule 4(k)(2) analysis, whereby "[a] district court is not required to analyze the laws of all fifty states to ascertain whether any state court of general jurisdiction has jurisdiction over the defendant." Instead, "if the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." <u>Id.</u> (alterations accepted) (quoting <u>ISI Int'l, Inc. v. Borden Ladner Gervais LLP</u>, 256 F.3d 548, 552 (7th Cir. 2001)).

PML "concede[d] that it is subject to personal jurisdiction in the Eastern District of Virginia for a properly pled claim of trademark registration cancellation." Dkt. No. 47 at 22. Because PML has consented to the jurisdiction of the Eastern District of Virginia, the Eastern District of Virginia may exercise personal jurisdiction over PML for this claim. <u>See</u> <u>ISI Int'l</u>, 256 F.3d at 552 ("Naming a more appropriate state [under a Rule 4(k)(2) analysis] would amount to a consent to personal jurisdiction there

(personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable).”). Section 37 of the Lanham Act gives district courts the power to cancel a trademark registration, so the Eastern District of Virginia may exercise subject matter jurisdiction over this claim as well. 15 U.S.C. § 1119 (“In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.”).

Personal jurisdiction, however, is claim specific. See, e.g., Argos Glob. Partner Servs., LLC v. Ciuchini, 446 F. Supp. 3d 1073, 1086–87 (S.D. Fla. 2020) (“Specific jurisdiction is claim-specific, and a court may hold it has specific personal jurisdiction over a defendant as to one claim but not as to another in the same suit.”). Because PML identified an alternate forum for its trademark cancellation claim, the Court cannot exercise personal jurisdiction for this claim under Rule 4(k)(2) and it must be **DISMISSED without prejudice**.[7] PML identifies an alternate forum only for its trademark cancellation claim, not for its other federal claims. Therefore, JISPA’s other federal claims satisfy

---

[7] Because the Court lacks personal jurisdiction over JISPA’s trademark cancellation claim, the Court will not determine whether JISPA also fails to state a claim for trademark cancellation. Madara, 916 F.2d at 1513–14.

Rule 4(k)(2)'s first hurdle, that they are not "subject to jurisdiction in any state's court of general jurisdiction." JISPA, however, cannot clear Rule 4(k)(2)'s second hurdle.

**B. Exercising jurisdiction is consistent with the United States Constitution and laws**

Rule 4(k)(2) requires the exercise of jurisdiction to be "consistent with the United States Constitution and laws." "Jurisdiction 'consistent with the Constitution and laws of the United States' is that which comports with due process." Sherritt, 216 F.3d at 1291. As JISPA recognizes, the Fifth Amendment—rather than the Fourteenth Amendment—Due Process clause applies under Rule 4(k)(2). Carrillo, 115 F.3d at 1543; Dkt. No. 51 at 8. The Eleventh Circuit, however, applies the same personal jurisdiction due process analysis under the Fifth Amendment as it applies under the Fourteenth Amendment, except the applicable forum for the minimum contacts analysis is the entire United States. See Sherrit, 216 F.3d at 1291, 1291 n.6 (applying the same test for Fifth Amendment Due Process as Fourteenth Amendment Due Process and citing Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055, 1057 (11th Cir. 1996), a case evaluating Fourteenth Amendment Due Process). Thus, "[c]onsiderations of [Fifth Amendment] due process require that a non-resident defendant have certain minimum contacts with the forum, so that the exercise of jurisdiction does not offend traditional notions of fair play and

substantial justice." Id. at 1291 (quoting Borg-Warner, 786 F.2d at 1057) (footnote omitted). As discussed supra page 12, like the "typical" state-centered personal jurisdiction analyses, Rule 4(k)(2) personal jurisdiction may be specific or general and "[t]he nature and quality of [the required] contacts . . . vary depending upon whether the type of personal jurisdiction being asserted is specific or general." Sherrit, 216 F.3d at 1291.

### i.   Rule 4(k)(2) Specific Jurisdiction

As with a "typical" state-centered specific jurisdiction analysis, Rule 4(k)(2) specific jurisdiction requires that a plaintiff's claims arise out of or relate to the defendant's contracts. See Sheritt, 216 F.3d at 1291. PML argues that JISPA's claims for trademark infringement and unfair competition do not arise out of or relate to PML's registration or licensing of its summer waves marks. Dkt. No. 47 at 14-15 (first citing USA Mgmt. Grp., LLC v. Fitness Publ'ns, Inc., No. 14-22477, 2015 WL 11233075, at *3, 5 (S.D. Fla. Mar. 4, 2015); then citing Duck Commander, Inc. v. TNP Prods., Inc., No. CIV.A. 10-1790, 2011 WL 4973880, at *2-4 (W.D. La. Sept. 12, 2011), R.&R. adopted, No. CIV.A. 10-1790, 2011 WL 4973828 (W.D. La. Oct. 19, 2011)). Both trademark infringement and unfair competition claims require use in commerce; liability does not arise from mere registration or licensing of an infringing mark. See 15 U.S.C. § 1114(1) (providing that any person who "use[s] in commerce any . . . colorable

27

imitation of a registered mark" or "colorably imitate[s] a
registered mark and appl[ies]" it to products "to be used in
commerce" is liable for trademark infringement); 15 U.S.C. § 1125
(requiring "use[] in commerce" for unfair competition liability);
see also Duck Commander, 2011 WL 4973880, at *4 ("Filing a
trademark application and licensing one's mark to another, even
with knowledge of a third party's superior rights to the mark, are
not activities prohibited by the Lanham Act. Rather, it is the use
in commerce of a registered mark that gives rise to liability.").

However, the cases PML cites use traditional state-specific
jurisdictional analyses rather than Rule 4(k)(2). See USA Mgmt.
Grp., 2015 WL 11233075, at *3, 5 (evaluating the defendant's
contacts with Florida and finding that the plaintiff "shows no
contact between [the defendant] and Florida, and thus cannot allege
a causal relationship to the purported infringement"); Duck
Commander, 2011 WL 4973880, at *2-4 (utilizing the Fifth Circuit's
"effects test" for intentional torts and finding that the plaintiff
"failed to show any intentional tort directed by [the defendant]
toward Louisiana"). Unlike in state-specific jurisdiction analyses
where the defendant's registration typically occurs outside of the
relevant forum, registration under a Rule 4(k)(2) analyses
constitutes another purposeful contact within the relevant forum
where the defendant seeks to avail itself of the benefits and

protections of the laws of the forum. Nevertheless, PML's argument still prevails under a Rule 4(k)(2) analysis.

The Eleventh Circuit has not had occasion to define the exact contours of what it means to "arise from" or be "related to" a defendant's contacts. See Fraser, 594 F.3d at 851. The circuit has clarified that "a pure 'but-for approach is over-inclusive, making any cause of action, no matter how unforeseeable, necessarily "related to" the initial contact.'" Id. (alterations accepted) (citations omitted). Instead, courts must "search for 'a closer and more substantial causal relationship between the relevant contacts and the alleged tort,'" which "entails a 'fact-sensitive inquiry hewing closely to the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests.'" Id. (alterations accepted) (citations omitted). For this reason, the Court is appreciative of the jurisdictional discovery conducted in this case.

Due to the attenuated causal connection between registration and licensing, JISPA's claims do not arise from or relate to PML's contacts. This is elucidated by Simone v. VSL Pharmaceuticals, Inc., No. CV TDC-15-1356, 2017 WL 658711, at *8 (D. Md. Feb. 16, 2017). In Simone, the court held that, "[w]hile a USPTO application might be a jurisdictionally significant contact under Rule 4(k)(2) *if that filing is itself the basis of the alleged injury*, that is not the situation here." Id. at *8 (emphasis added) (citing

_Touchcom, Inc. v. Bereskin & Parr_, 574 F.3d 1403 (Fed. Cir. 2009)). The _Simone_ court cited _Touchcom_, 574 F.3d at 1403, where the Federal Circuit exercised personal jurisdiction under Rule 4(k)(2) in a legal malpractice case against the defendant attorneys for flawed filing of a patent application. In _Touchcom_, the defendant's deficient filing of a patent application formed the basis of plaintiff's claims for legal malpractice and was thus a jurisdictionally significant contact. 574 F.3d at 1416–17. Phrased differently, the attorneys' deficient filing was the direct logical precedent to the plaintiff's claims, and without the negligent filing, no claim could arise. But in _Simone_, because the plaintiff alleged trademark infringement, unfair competition, and sought trademark cancellation, the defendant's "filing of trademark applications [was] not commensurate with the alleged infringement of [the plaintiff's] separately registered trademark." 2017 WL 658711, at *8. Instead, a party's _use, rather than its registration_, of a trademark was the behavior analogous to the defendants' deficient patent filing in _Touchcom_. _See also Astor Chocolate Corp. v. Elite Gold Ltd._, 510 F. Supp. 3d 108, 136 (S.D.N.Y. 2020) ("[T]he weight of authority rejects basing federal long-arm jurisdiction on the mere registration of a U.S. trademark" and collecting cases).[8]

---

[8] As discussed infra note 10, JISPA cites Ninth Circuit precedent to argue that "entering into a license agreement with a United

States based entity qualified as purposefully direct activities at the United States." Dkt. No. 51 at 11 (citing Universal Music MGB NA LLC et al. v. Quantum Music Works, Inc., 769 F. App'x 445 (9th Cir. 2019); Monster Cable Prod., Inc. v. Euroflex S.R.L., 642 F. Supp. 2d 1001, 1008-09 (N.D. Cal. 2009)). For the reasons discussed above, the Court finds this argument unpersuasive. There are other reasons for distinction as well.

In Universal Music MGB, 769 F. App'x at 446, the court did not thoroughly evaluate whether the plaintiff's claims arose from the defendant's contacts with the United States, stating only that the defendant's "selling of a license to NBCUniversal through its website for use in a U.S.-based advertising campaign plainly underlies [the] [p]laintiff's copyright infringement claim." Id. In addition to licensing a copyright, the Universal Music defendant ran "an English-language website which 'allowed and promoted the transaction of business within' the United States and encouraged users to 'enter into contracts that involve the knowing and repeated transmission of computer files over the Internet.'" Id. (alterations accepted) (internal citations omitted). JISPA does not point to similar express targeting by PML of the United States in its licensing agreements or through the surrounding circumstances. See generally Dkt. No. 6; Dkt. No. 51; Dkt. No. 65.

Additionally, subsequent courts in the same district as the Monster court have disavowed Monster's holding. See, e.g., Fumoto Giken Co. Ltd. v. Mistuoka, No. CV 14-9797, 2015 WL 12766167, at *5 (C.D. Cal. Apr. 16, 2015) ("Monster is not binding on this Court, however, and no other courts appear to have subsequently followed this line of reasoning. Particularly given the Ninth Circuit's cautious application of Rule 4(k)(2), this Court is not persuaded that the mere registration of a trademark with the PTO, without more, amounts to the type of minimum contacts which would justify haling a foreign defendant into federal court." (footnote omitted)).

Lastly, as PML notes, JISPA cites to two Ninth Circuit cases, and "courts including the Ninth Circuit have adopted a 'flexible approach' that may allow personal jurisdiction with a lesser showing of minimum contacts where dictated by considerations of reasonableness." Monster, 642 F. Supp. 2d at 1007, 1010; Dkt. No. 52 at 11. The Eleventh Circuit does not rely upon the flexible approach to the same extent as the Ninth Circuit. Instead, the Eleventh Circuit first tends to evaluate whether the defendant has minimum contacts. See, e.g., Carrillo, 115 F.3d at 1546-47. If the defendant has minimum contacts, the Eleventh Circuit will evaluate

Candidly, this is a fairly close case. PML registered its summer waves marks and licensed them to other companies. Dkt. No. 6 ¶ 35; Dkt. No. 51 at 5. The other companies' *use* of PML's summer waves marks was the direct logical precedent to JISPA's claims—if the companies had not used the marks, then JISPA could not assert trademark infringement or unfair competition against PML even though PML registered improper marks. Thus, the causal connection in this case is attenuated like in <u>Simone</u>, rather than direct like in <u>Touchcom</u>.

However, as alleged, PML registered marks whose use would infringe JISPA's mark and licensed those marks to other companies.

---

whether the reasonableness factors are satisfied. <u>See, e.g.</u>, <u>id.</u> (evaluating the reasonableness factors after determining the defendant had minimum contacts); <u>Oldfield</u>, 558 F.3d at 1223 (determining the defendant did not have minimum contacts and ending the due process analysis without evaluating the reasonableness factors); <u>Borg-Warner</u>, 786 F.2d at 1062 (same); <u>see also</u> 4 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1067.2 (4th ed. 2022 update) (stating that the "<u>Burger King[ Corp. v. Rudzewicz</u>, 471 U.S. 462 (1985),]decision markedly downplayed the importance of [the reasonableness] factors in [a] latter group of cases . . . ." and noting that Justice Kennedy's plurality opinion and Justice Breyer's concurring opinion in <u>J. McIntyre Machinery Ltd. v. Nicastro</u>, 564 U.S. 873 (2011) "did not discuss the reasonableness or fairness factors set forth in earlier case law, but there was no need for them to do so since both Justices Kennedy and Breyer concluded that J. McIntyre had not purposefully established minimum contacts with New Jersey, which is the first requirement of the traditional test"); <u>but see</u> <u>Robinson v. Giarmarco & Bill, P.C.</u>, 74 F.3d 253, 259 (11th Cir. 1996) ("[T]hese [reasonableness] considerations may serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." (citing <u>Burger King Corp.</u>, 471 U.S. at 477). Thus, JISPA's reliance upon these cases is not persuasive.

Dkt. No. 6 ¶¶ 35, 50. While this is not infringing activity under the Lanham Act, it was reasonably foreseeable that PML's actions would lead to torts against United States' plaintiffs. In fact, PML knew specifically that its license impacted JISPA because it sought to buy JISPA's domain name. Dkt. No. 6 ¶ 34. PML has also taken advantage of the United States' protections by registering its marks, so it could reasonably anticipate being held to account for violating those protections.[9]

Nevertheless, these factors are likely insufficient for this Court to properly exercise jurisdiction under the Due Process clause. In Sunshine Distribution, Inc. v. Sports Authority Michigan, Inc., 157 F. Supp. 2d 779 (E.D. Mich. 2001), the court exercised jurisdiction under Rule 4(k)(2) in part based on the defendant's registration and licensing of marks. In Sunshine Distribution, like in this case, the defendant "made a deliberate decision to register its marks with the United States Patent and Trademark Office." Id. at 789. However, the defendant also "sought out and negotiated a licensing agreement with [the licensee company] to distribute its products throughout . . . the United States," it essentially created the licensee company, and the licensee company was the defendant's exclusive distributor, which

---

[9] This bears more on purposeful availment, but foreseeability is also relevant to whether a claim relates to the relevant contact. See Fraser, 594 F.3d at 851.

made it clear that the defendant "purposefully sought out and created a United States distributor to exploit the United States market." Id. While PML licensed use of the mark, JISPA has not alleged that PML exercised any continuing control or obligations over the license, that the licenses were exclusive, or that PML retained control over its licensees' sales or marketing. Cf. Breckenridge Pharm., Inc. v. Metabolite Labs., Inc., 444 F.3d 1356, 1366 (Fed. Cir. 2006) (holding that a defendant may not be subject to personal jurisdiction where the defendant has licensed a patent in the forum state but does not "exercise control over the licensees' sales activities and, instead, has no dealings with those licensees beyond the receipt of royalty income" (citing Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1357–58 (Fed. Cir. 1998))); Eco Pro Painting, LLC v. Sherwin-Williams Co., 807 F. Supp. 2d 732, 737 (N.D. Ill. 2011) ("As a general rule, personal jurisdiction does not exist over a licensor by virtue of its status if it does not exercise control over the licensee's sales activities and has no dealings with the licensee 'beyond the receipt of royalty income.'" (quoting Eragen Biosciences, Inc. v. Nucleic Acids Licensing, LLC, 447 F. Supp. 2d 930, 938 (W.D. Wisc. 2006))). Thus, the causal connection between PML's registration and licensing of the marks and JISPA's claims is attenuated.

Importantly, the plaintiff's claims themselves form the basis of specific jurisdiction. Fraser, 594 F.3d at 851. Here, JISPA is

not asserting a claim like contributory infringement, legal malpractice for improper filing of a mark, or breach of contract premised upon a trademark license where the trademark registration or license will be at issue when determining liability. Instead, JISPA asserts claims for unfair competition and trademark infringement, which require a party—in this case a third party, separate from PML—to use a mark. Ultimately, these contacts do not form a "a close[] and . . . substantial causal relationship between the relevant contacts and the alleged tort." Id. As such, JISPA's claims do not arise from or relate to PML's registration or licensing of PML's summer waves marks. Cf. Quick Techs., Inc. v. Sage Grp. PLC, 313 F.3d 338, 345 (5th Cir. 2002) (the plaintiff's trademark infringement claim did not sufficiently "arise out of or relate to" the defendant's contacts where the defendant filed an intent to use applications and its subsidiaries were using the mark in United States commerce). Because the Court lacks personal jurisdiction over PML, JISPA's claims are **DISMISSED without prejudice.**

### ii. Rule 4(k)(2) General Jurisdiction

JISPA argues only that the Court may exercise general jurisdiction under Rule 4(k)(2). Dkt. No. 51 at 10. According to JISPA, "PML has . . . engaged in numerous agreements, assignments, lawsuits, and monitoring the use of its trademarks across the United States and most notably in Georgia." Id. at 11. JISPA lists

"PML's general counsel['s] attempt[] to purchase the summerwaves.com domain name from Jekyll" as the most notable example of this. Id.[10] JISPA also notes PML's other United States contacts: PML designated United States forums in choice-of-law provisions in several of its contracts; PML executed a Trademark Purchase and Use agreement in Virginia with a Virginia corporation; PML received numerous assignments recorded with the USPTO; PML has a Senior Vice President who is the "Head of North American Operations"; and PML "received assignments from two separate United States citizens acting as inventor." Dkt. No. 51 at 12–13.

The Eleventh Circuit has "emphasize[d] that a nonresident corporation's contacts with the forum that are unrelated to the litigation must be substantial in order to warrant the exercise of personal jurisdiction under Rule 4(k)(2)." Sherritt, 216 F.3d at 1292. While JISPA successfully lists several sporadic contacts PML has with the United States as a whole, PML's "limited and sporadic connections with the forum are not the sort of general systematic business contacts required to sustain the assertion of general

---

[10] To support its argument, JISPA cites Ninth Circuit precedent to argue that "entering into a license agreement with a United States based entity qualified as purposefully direct activities at the United States." Id. (citing Universal Music, 769 F. App'x at 445; Monster, 642 F. Supp. 2d at 1008-09). This is a specific, not a general, jurisdiction argument because it addresses whether the defendant has minimum contacts with the relevant forum. See supra pp. 26–27. Thus, it is not relevant to a general jurisdiction analysis.

personal jurisdiction." Id. PML's United States contacts are far less substantial than other defendant's contacts in cases where courts have similarly found they lacked general jurisdiction. Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A., 197 F.3d 1070, 1075 (11th Cir. 1999) (summarizing cases); id. ("A party's contacts with the forum that are *unrelated* to the litigation must be pervasive in order to support the exercise of personal jurisdiction under Rule 4(k)(2).").

First, PML's assignments and agreements in the United States are not sufficient to convey personal jurisdiction. See Sherritt, 216 F.3d at 1293 ("[W]here a foreign corporation does not engage in general business in the forum, simply negotiating a contract there will not support general in personam jurisdiction." (citing Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*,* 792 F.2d 989, 992 (11th Cir. 1986))); cf. Associated Transp. Line, 197 F.3d at 1075 ("[A] party's purchases in the United States are never enough to justify jurisdiction.").

Next, even accepting that PML does have a North American Senior Vice President and several U.S. employees, this is not sufficient for general jurisdiction because "[g]eneral jurisdiction has been found lacking even where a company had employees, agencies and salespeople regularly in the forum; where the company was qualified to do business in the forum; and where it regularly solicited business and derived more than 26% of its

income from the forum." <u>Associated Transp. Line</u>, 197 F.3d at 1075 (first citing <u>Noonan v. Winston Co.</u>, 135 F.3d 85, 93–94 (1st Cir. 1998); and then citing <u>Nichols v. G.D. Searle Co.</u>, 991 F.2d 1195, 1198 (4th Cir. 1993)). Here, JISPA argues that PML has a few United States employees, but PML is not qualified to do business in the United States, it does not regularly solicit business from the United States, and it does not derive a substantial amount of its income from the forum.

PML's wide use of United States courts, the USPTO, and its forum selection clauses might support an argument that PML purposefully availed itself of the United States as a forum depending on the facts of the specific case. <u>See</u> Dkt. No. 51 at 2–4, 12–13; Dkt. No. 65 at 5–7. But while these contacts might give rise to specific jurisdiction under certain circumstances (or personal jurisdiction by consent regarding forum selection clauses), the contacts are not "'so continuous and systematic' as to render it essentially at home" in the United States. <u>Daimler</u>, 571 U.S. at 118 (citing <u>Goodyear</u>, 546 U.S. at 924). While PML has sporadically utilized the courts and intellectual property protections offered by the United States, it has not essentially moved the nerve center of its operations to the United States like the defendant in <u>Perkins</u>. 342 U.S. at 447–49. Thus, PML's contacts

are not so continuous and systematic as to merit treatment as the equivalent of general jurisdiction's paradigm forums.[11]

In the alternative, JISPA argues that PML is subject to general jurisdiction "based upon attribution, agency, and merger theory" because PML's wholly-owned subsidiary, MCO, has sufficient contacts with the United States. Dkt. No. 51 at 13–14.[12] These arguments do not prevail.

---

[11] JISPA argues that Daimler, 571 U.S. at 117, and Goodyear, 564 U.S. at 915, are inapplicable to this case, attempting to distinguish the cases on the basis that they did not invoke Rule 4(k)(2). Dkt. No. 51 at 8. As discussed supra pages 26–27, the Eleventh Circuit applies the same constitutional tests under Rule 4(k)(2) as under a "typical" state-centered analysis. The only difference is that the relevant forum at issue is the entire United States rather than a particular state. Sherritt, 216 F.3d at 1291 n.6. Thus, JISPA's attempts to distinguish these cases on that basis are unavailing.

JISPA also objects to use of Daimler's Fourteenth Amendment "at home" test under a Rule 4(k)(2) analysis, noting that "the Fifth Circuit recently recognized that its Patter[]son analysis [which applied the Daimler "at home" standard] must be revisited." Dkt. No. 51 at 7 n.1 (citing Douglass v. Nippon Yusen Kabushiki Kaisha, 996 F.3d 289 (5th Cir. 2021), reh'g en banc granted, opinion vacated sub nom. Douglass v. Kaisha, 2 F.4th 525 (5th Cir. 2021)). This Court is governed by Eleventh Circuit precedent, which continues to utilize the Daimler "at home" test and has not drawn a distinction between due process analyses under a Fifth Amendment Rule 4(k)(2) standard or under a traditional Fourteenth Amendment standard. See, e.g., Foshee v. Banks, No. 22-11321, 2022 WL 17547200, at *1 (11th Cir. Dec. 9, 2022) (citing the "at home" standard when analyzing general jurisdiction); Sherrit, 216 F.3d at 1292 (discussing due process requirements under Rule 4(k)(2) and noting that "[t]he due process requirements for general personal jurisdiction . . . require a showing of continuous and systematic general business contacts between the defendant and the forum state"). Therefore, JISPA's argument does not prevail.
[12] PML argues that JISPA raising this argument for the first time in its opposition prejudices PML. Dkt. No. 52 at 20. JISPA is not

> It is well established that as long as a parent and a
> subsidiary are separate and distinct corporate entities,
> the presence of one in a forum state may not be
> attributed to the other. Cannon Manufacturing Co. v.
> Cudahy Packing Co., 267 U.S. 333, 337 . . . (1925).
> Generally, a foreign parent corporation is not subject
> to the jurisdiction of a forum state merely because a
> subsidiary is doing business there. Where the
> "subsidiary's presence in the state is primarily for the
> purpose of carrying on its own business and the
> subsidiary has preserved some semblance of independence
> from the parent, jurisdiction over the parent may not be
> acquired on the basis of the local activities of the
> subsidiary." Portera v. Winn Dixie of Montgomery,
> Inc., 996 F. Supp. 1418, 1423 (M.D. Ala. 1998), quoting
> Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc.
> § 1069 (2d ed. 1987).

Sherritt, 216 F.3d at 1293. For a subsidiary's activities to convey

general jurisdiction over the defendant, the plaintiff must show

that the subsidiary's "corporate existence was simply a formality,

and that it was merely [the defendant's] agent." Id. at 1293-94.

The burden rests on the plaintiff to establish this. Id. at 1294.

JISPA argues that MCO's contacts are attributable to PML

because "PLMCO serves as PML's agent for marketing and distributing

products bearing and protected by PML's intellectual property."

Dkt. No. 51 at 16. MCO simply acting as a subsidiary and performing

tasks that PML does not perform is not sufficient to attribute

MCO's contacts to PML. See Sherritt, 216 F.3d at 1293-94. Without

---

limited to the same arguments it made in its opposition to PML's
initial motion to dismiss. Furthermore, the Court need not
determine whether JISPA is prejudiced because PML's arguments
fail, as discussed below.

more, this does not indicate that MCO's "corporate existence [is] simply a formality." Id.

In Sherritt, the court did not impute the subsidiary's contacts to the defendant where the subsidiary had its own officers and boards of directors, determined its own pricing and marketing practices, and had its own bank accounts, offices, and employees. Id. at 1294. Here, JISPA highlights that MCO and PML are held by the same ultimate holdings company; MCO and PML are represented by the same law firm; the directors of PML are also officers or directors of MCO; PML has an amount due to its subsidiary each year from 2010 through 2018; and MCO is PML's only subsidiary. Dkt. No. 51 at 19. These facts are insufficient to establish that MCO is simply PML's agent.

First, that PML and MCO are held by the same holdings company or that MCO is PML's only subsidiary does not indicate that MCO's existence is a mere formality. Holding otherwise would disregard the entire notion of corporate separateness. Instead, attribution analysis depends on the overlap in personnel, function, and finances. Cf. Sherritt, 216 F.3d at 1293. Second, JISPA cites no authority indicating that using the same counsel (provided this counsel is not also serving as an officer or director) impacts corporate separateness, see dkt. no. 51 at 19, and finding that it does could impact a corporation's ability to retain counsel of its choice.

Further, while the overlap of directors and annual payment weighs in favor of attribution, this is not enough evidence to indicate that MCO is a "mere instrumentali[ty]" of PML, Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1273 (11th Cir. 2002), because MCO "has preserved some semblance of independence" from PML, Sherritt, 216 F.3d at 1293 (quoting Portera, 996 F. Supp. at 1423). As PML argues, MCO does not actually import product into the United States. Dkt. No. 47-1 at 22:20-23:2. Instead, MCO sells product and transfers title to global retailers, who may then bring product to the markets they choose. Id. Thus, MCO serves a distinct role from PML, and without more evidence, the Court cannot conclude that MCO is a "mere instrumentali[ty]" of PML simply because the companies share directors or PML annually pays MCO a fee. Meier, 288 F.3d at 1273. These connections are far less than in Meier, 288 F.3d at 1272-73, where the court attributed the subsidiaries' contacts to the defendants because the subsidiaries coordinated fifty-percent of the defendants' guests, coordinated all advertising and marketing for the defendants, provided accounting services, maintained direct communication links with the defendants, and maintained and managed several bank accounts on behalf of defendants.

Furthermore—even if the Court could attribute MCO's contacts to PML—JISPA has not established that MCO has enough contacts with the United States for the Court to exercise general jurisdiction.

MCO is a Macau corporation and does not import product into the United States. Dkt. No. 47-2 at 6, 8; Dkt. No. 47-1 at 22:20-23:3. Instead, JISPA argues that MCO is subject to general jurisdiction because MCO has "engaged in professional associations based in the U.S."; and MCO "has submitted numerous applications with federal agencies of the U.S."[13] Dkt. No. 51 at 20. For the same reasons that PML's contacts are insufficient to confer general jurisdiction, MCO's contacts are not "'so continuous and systematic' as to render it essentially at home" in the United States. Daimler, 571 U.S. at 118 (citing Goodyear, 546 U.S. at 923-24).

JISPA's merger or "alter ego" argument fails for similar reasons. To support its argument, JISPA cites twelve factors the Eleventh Circuit has used to determine whether a subsidiary is an alter ego of its parent. Dkt. No. 51 at 18 (citing United

---

[13] PML disputes these assertions. Dkt. No. 52 at 22-24. Even accepting them as true, they are insufficient to convey general jurisdiction.

Additionally, JISPA initially argued that PML "has directly imported goods into the United States, including those bearing the federally registered SUMMER WAVES trademarks." Dkt. No. 51 at 20 (citing Dkt. No. 51-1 ¶ 144, Dkt. No. 51-65). JISPA argued that Dkt. No. 51-65 was MCO's "import summary," showing MCO's "extensive business" of importing goods to the United States bearing PML's federally registered marks. Dkt. No. 51-1 ¶ 144. PML clarified that Dkt. No. 51-65 shows which products were *returned* to MCO, not *imported by* MCO. Dkt. No. 52 at 22-23; see Dkt. No. 51-56 (listing the items' "return date"). JISPA did not rebut this or offer further proof that MCO imports a substantial amount of goods to the United States. See generally Dkt. No. 65.

Steelworkers of Am. v. Connors Steel Co., 855 F.2d 1499, 1505 (11th

Cir. 1988). These factors are whether:

> (1) the parent and the subsidiary have common stock
> ownership;
> (2) the parent and the subsidiary have common directors
> or officers;
> (3) the parent and the subsidiary have common business
> departments;
> (4) the parent and the subsidiary file consolidated
> financial statements and tax returns;
> (5) the parent finances the subsidiary;
> (6) the parent caused the incorporation of the
> subsidiary;
> (7) the subsidiary operates with grossly inadequate
> capital;
> (8) the parent pays the salaries and other expenses of
> the subsidiary;
> (9) the subsidiary receives no business except that
> given to it by the parent;
> (10) the parent uses the subsidiary's property as its
> own;
> (11) the daily operations of the two corporations are
> not kept separate; and
> (12) the subsidiary does not observe the basic corporate
> formalities, such as keeping separate books and records
> and holding shareholder and board meetings.

United Steelworkers, 855 F.2d at 1505.

As previously mentioned, JISPA argues that MCO is the alter

ego of PML because MCO and PML are held by the same ultimate

holdings company (not one of the United Steelworkers factors) and

MCO and PML are represented by the same law firm (not one of the

factors); the directors of PML are also officers or directors of

MCO (factor 2); PML has an amount due to its subsidiary each year

from 2010 through 2018 (factor 5); and MCO is PML's only subsidiary

(perhaps factor 6). Dkt. No. 51 at 19. However, "it is not

necessary that plaintiffs prove the existence of all twelve factors" and the court must examine the totality of the circumstances when conducting its analysis. United Steelworkers, 855 F.2d at 1505–06. Furthermore, JISPA argues that "[t]he threshold for establishing personal jurisdiction under Rule 4(k)(2) based on an alter ego theory . . . is less rigorous than piercing the veil via alter ego for purposes of liability." Dkt. No. 51 at 17.

Even accepting JISPA's argument that a Rule 4(k)(2) alter ego analysis is less rigorous than a traditional analysis, JISPA has not presented enough evidence to indicate that MCO is the alter ego of PML. For the same reasons discussed above, that MCO and PML are held by the same holdings company and the companies use the same counsel does not weigh against a finding of corporate separateness. Similarly, JISPA has not provided evidence that PML caused the incorporation of MCO, even though MCO is PML's only subsidiary. In contrast, PML and MCO's overlap of directors and annual payment weigh against finding corporate separateness.

Nevertheless, when considering the totality of the evidence, this is not enough to show an "unusually high degree of control over the subsidiary" required for the alter ego analysis—or even a relatively high degree of control if the standard is lower under Rule 4(k)(2). Home Legend, LLC v. Mannington Mills, Inc., No. 4:12-CV-0237-HLM, 2014 WL 12489761, at *14 (N.D. Ga. July 2, 2014)

45

(quoting Parker v. Brush Wellman, Inc., 377 F. Supp. 2d 1290, 1304 (N.D. Ga. Mar. 29, 2005)); see also id. (finding no personal jurisdiction under Rule 4(k)(2) based on the alter ego theory where the defendant and its subsidiary had an exclusive distribution agreement, overlapping board members, and consolidated financial statements for accounting purposes, among other factors). Lastly, even if this Court is applying too stringent an alter ego analysis for a Rule 4(k)(2) analysis, JISPA has failed to establish that the Court has Rule 4(k)(2) general jurisdiction over MCO for the reasons discussed above.

### III. JISPA is not entitled to sanctions.

Both under its inherent authority and under 28 U.S.C. § 1927, the Court has the power to impose sanctions. Under § 1927, "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." "[A]n attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1239 (11th Cir. 2007) (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991)). "A party [may] demonstrate[] bad faith by

46

delaying or disrupting the litigation or hampering enforcement of a court order." Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998). This is an objective standard, and "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently." Amlong & Amlong, 500 F.3d at 1241. Mere negligent conduct is not enough to satisfy the bad faith standard; the attorney must have acted knowingly or recklessly to act with bad faith. Id. at 1241-42.

Furthermore, "[c]ourts have the inherent power to police those appearing before them." Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017). "A court may exercise this power 'to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Id. (quoting Marx v. Gen. Revenue Corp., 568 U.S. 371, 382, 133 (2013)). Nevertheless, the Court's inherent power "'must be exercised with restraint and discretion' and used 'to fashion an appropriate sanction for conduct which abuses the judicial process.'" Id. (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991)); Kornhauser v. Comm'r of Soc. Sec., 685 F.3d 1254, 1257 (11th Cir. 2012); see also Purchasing Power, LLC, 851 F.3d at 1223 ("[The Court's inherent] power 'must be exercised with restraint and discretion' and used 'to fashion an appropriate sanction for

conduct which abuses the judicial process.'" (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991))).

JISPA requests the Court impose sanctions pursuant to its inherent authority and § 1927 by awarding JISPA fees and costs it incurred responding to PML's motions, particularly for PML's dilatory conduct during litigation. Dkt. No. 51 at 22. JISPA argues that PML "repeatedly ma[de] affirmative statements that [were] directly contradicted by its prior statements made in other courts and tribunals and by documentary evidence it produced in other litigations (and refused to produce in this litigation)," which delayed and disrupted the litigation and caused Jekyll to expend significant attorneys' fees and costs and continue to suffer from PML's infringement. Id.

PML responds that its actions were not dilatory because "PML provided written discovery responses, produced documents, and provided a full day of deposition testimony within the scope of the Court's Order." Dkt. No. 52 at 6-7. PML asserts it objected to discovery requests that exceeded the scope of the Court's order, which it believes were limited only to specific personal jurisdiction. Id. at 7. Furthermore, PML notes that JISPA did not file a motion to compel or complain about PML's responses until it moved for sanctions. Id. Instead, JISPA subpoenaed the law firm Maslon LLP, obtained a multitude of documents that PML asserts fell outside the scope of discovery, and "deposed PML for a full

day," asking questions that PML asserts fell outside the scope of discovery. Id.

 The Court's order denying PML's first motion to dismiss and granting jurisdictional discovery, dkt. no. 37, noted that the parties disputed whether PML "does business in the state of Georgia by, among other possibilities, offering to sell the infringing goods that are the subject of this action" and whether PML "uses the Summer Waves mark in United States commerce writ large." Id. at 3-4 (alterations accepted) (citations omitted). The Court ordered the parties to "explore these (and any closely related) issues." Id. at 4. PML's argument that this means the parties could explore only issues related to specific jurisdiction does not stand. Whether PML "uses the Summer Waves mark in United States commerce writ large" is relevant for both general and specific jurisdiction, and a party is not required to make the same arguments in response to a renewed motion to dismiss as it did in response to a previous motion. Nevertheless, PML's specific jurisdiction stance does not rise to the level of recklessness needed to show bad faith. The Court has no reason to doubt that PML advanced a good-faith argument regarding the scope of jurisdictional discovery, as it has a right to do. PML otherwise complied with discovery, and JISPA subpoenaed Maslon LLP rather than filing a motion to compel. Thus, PML's actions do not amount to bad faith and do not merit sanctions.

Nevertheless, the Court is troubled by PML's conflicting messages in other cases regarding whether it conducts business in the United States; the messages are seemingly dependent on PML's status as plaintiff or defendant. See Dkt. No. 51 at 3. PML argues its prior court filings that reflect PML "marketed, distributed, and sold" products in the United States are mere mistakes and those previous admissions are not binding in this case. Dkt. No. 52 at 15 (citing In re Raiford, 695 F.2d 521, 523 (11th Cir. 1983) ("Normally judicial admissions are binding for the purpose of the case in which the admissions are made, not in separate and subsequent cases.")). These "mistakes" by PML amount at least to negligence, particularly because PML is represented by experienced and sophisticated counsel. But because nothing indicates that PML purposefully misrepresented whether it marketed, distributed, and sold products in the United States in this specific case, these prior actions do not amount to bad faith in this case. Cf. Chambers, 501 U.S. at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion.").

The Court is also troubled by one of PML's interrogatory responses. In one of its interrogatories, JISPA inquired whether any of PML's representatives had ever traveled to Georgia in connection with their employment with PML. Dkt. No. 47-2 at 11. Part of PML's response stated that it "*does not license*, advertise, market, or promote its [Summer Waves] trademarks and therefore,

has no budget or expenditures for such [travel] activities." Id. at 12.

This does not appear to be fully accurate. Documents JISPA obtained from Maslon LLP show that PML has licensed its marks to other entities. Dkt. No. 51-1 ¶¶ 84–88. Further, PML stated in its first motion to dismiss—written months prior to the interrogatory response—that PML "permits" other entities to use its Summer Waves marks. Dkt. No. 10 at 12 ("[I]t permits use by other entities."); Dkt. No. 10-1 ¶ 6 (affidavit attached to the first motion to dismiss stating that "PML registers and holds intellectual property, to which it permits use by other entities"); see also Dkt. No. 51-21 at 215:5-7 (deposition testimony taken after the interrogatory response stating that PML "allows" or "enables" others to use its IP). Later, in PML's second motion to dismiss, it admitted that it licenses marks to other entities. Dkt. No. 47 at 13–14. Thus, PML's interrogatory response could be considered misleading or negligent. However, because PML had previously admitted that it permits other entities to use its marks; PML otherwise explained its connection to other entities' use of its marks; PML later admitted it licensed the marks; and the interrogatory question was not directed specifically towards PML's licensing activities, this conduct does not merit the potent reprimand of sanctions. Thus, JISPA's request for sanctions is **DENIED**.

**CONCLUSION**

Because the Court lacks personal jurisdiction over PML as to each of JISPA's claims, PML's renewed motion to dismiss, dkt. no. 47, is **GRANTED**, and JISPA's claims are **DISMISSED without prejudice**. Further, JISPA's request for sanctions, dkt. no. 51, is **DENIED**. There being no claims remaining in this action, the Clerk is **DIRECTED** to **CLOSE** this case.

**SO ORDERED** this 24th day of March, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA